**SO ORDERED: February 04, 2011.**





**Anthony J. Metz III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GREENWOOD POINT, LP, | ) | Case No. 10-00569-AJM-11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**ORDER UNDER 11 U.S.C. § 1129 AND RULE 3020 OF THE FEDERAL RULES
OF BANKRUPTCY PROCEDURE CONFIRMING THE DEBTOR'S
REVISED PLAN OF REORGANIZATION DATED OCTOBER 15, 2010**

The Debtor filed its Revised Plan of Reorganization ("the Plan") on October 15, 2010 to

which CWCapital Asset Management, LLC, ("CWCapital") solely in its capacity as Special

Servicer for Bank of America, N.A., as successor by merger to LaSalle Bank, National

Association, as Trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2000–

C4, Commercial Mortgage Pass-Through Certificates, Series 2000–C4 ("the Trust") objected.

The Court held an evidentiary hearing which commenced on November 15, 2010 and concluded

on November 19, 2010   (the "Confirmation Hearing"). The Court, having considered the

Debtor's Revised Plan of Reorganization (the "Plan"), the Debtor's Revised Disclosure

Statement for the Debtor's Revised Plan of Reorganization filed October 15, 2010 (the "Disclosure Statement"), the Ballot Report, the record of this bankruptcy case, including the result of a valuation hearing held by this Court, and the testimony of Jeffrey Scott Roberts, Joyce A. Bradley, George P. Broadbent, Mary Clare Broadbent, Scott Powell, Phillip Weiss, Michael Arbuckle, and Demetrios Morakis, and the arguments of counsel made at the hearings on confirmation of the Plan, and after due deliberation thereon, and good and sufficient cause appearing therefore,  hereby makes the following findings of fact, conclusions of law, and enters this Order (the "Confirmation Order") confirming the Debtor's Revised Plan of Reorganization dated October 15, 2010.

## I.  Background

### A. The Debtor

The Debtor is an Indiana limited partnership formed in 1998 in which George Broadbent ("George") holds a 99% limited partner equity interest and Greenwood Point Management, Inc. holds a 1% general partner equity interest.  George is the sole owner of Greenwood Point Management, Inc.  The Debtor owns a retail shopping center containing approximately 136,000 square feet of gross leasable space located at 8010-8040 U.S. 31 South, Indianapolis, Indiana 46227 and other property (collectively, the "Property").  The Property is subject to a Mortgage and Security Agreement (the "Mortgage") and Assignment of Leases and Rents currently held by the Trust.  The Mortgage and Assignment of Leases and Rents secure a loan in the amount of $7,650,000 made pursuant to Promissory Note held by the Trust.  The Trust also holds a Guaranty of Recourse Obligations provided by the Debtor.

The Note matured on October 1, 2009, after which CWCapital, on behalf of the Trust, sued the Debtor in the Marion Superior Court for the appointment of a receiver.  On January 20,

2010 (the "Petition Date"), the day on which the state court was to hold a hearing on the

CWCapital's receivership motion, the Debtor filed a voluntary petition for relief under Chapter

11 of the Bankruptcy Code and commenced this single asset real estate case.

The Debtor has no employees and is managed by The Broadbent Company ("TBC").

TBC was owned by George until March, 2010 when he transferred it to his wife, Mary Clare

Broadbent ("Mary Clare"), for $50,000.  The Debtor and TBC entered into a Shopping Center

Management and Leasing Agreement dated February 5, 1999 (the "Management Agreement")

which provides that TBC is responsible for and has discretion and control over (i) collections, (ii)

maintenance, (iii) governmental compliance, (iv) contracts, (v) tenant relations, (vi) banking,

(vii) disbursements, (viii) records and reports, (ix) budget, (x) tenant compliance, (xi) leasing,

and (xii) insurance.   For these services, TBC receives 4.25% of the gross revenue collected or

accrued with respect to the Debtor each month and reasonable out-of-pocket expenses, including

"all leasing or brokerage commissions paid in connection with the leasing of the Property."

Since the sale of TBC, George has continued as President and receives an annual salary of

$600,000 from TBC.  George or entities related to him own between 35 and 40 other shopping

centers and TBC manages them.  George testified that the $50,000 Mary Clare paid to him is the

full value of the company.

### B.  The Plan and Voting

The Plan provides for seven (7) classes of claims and interests:

> (i)      Class 1—Allowed Secured Claim of CWCapital, in the
>          approximate amount of $4,514,896;
>
> (ii)     Class 2—Administrative Claims (Bankruptcy Court Costs and
>          Professional Fees), in the approximate amount of $185,000;
>
> (iii)    Class 3—Administrative Operating Expenses, in the approximate
>          amount of $25,000;

(iv)      Class 4—Secured Tax Claim, in the approximate amount of $155,285;

(v)      Class 5A—Allowed Non-Priority Unsecured Claim of CWCapital, in the approximate amount of $2,376,993;

(vi)      Class 5B—Allowed Non-Priority Unsecured Claims, in the approximate amount of $54,505;

(vii)      Class 6—Equity Interests.

Class 2 and 3 administrative claims are being paid in full, are not impaired, and are deemed to have accepted the Plan. There is no distribution on account of Class 6 (equity) and it is deemed to have rejected the Plan. The Plan further provides for the cancellation of all current Class 6 equity interests of the Debtor and the issuance by the reorganized debtor of new equity interests to new limited and general partners owned by Mary Clare (the "Reorganized Debtor") for a capital infusion of $100,000.

The Plan provides that Classes 1, 4, 5A and 5B are impaired are therefore entitled to vote on the Plan. The Plan proposes to pay CWCapital's Class 1 secured claim valued at $4,514,896, over 10 years, with a 20-year amortization, interest at 6.25% and a balloon payment at the end of the 10 years, pursuant to an amended and restated promissory note, mortgage and assignment of leases and rents. It proposes to pay the principal amount of the Class 4 secured tax claim ten days after the effective date, with interest payment of $12,422.80 (but calculated by CWCapital to be approximately $1,000) to be made over the subsequent two months. The Plan proposes to distribute $0.15 per dollar to the Class 5A and Class 5B unsecured claims, which amount would be spread over a period of four and one-half years. Of the four impaired classes of creditors, classes 1 and 5A (CWCapital's secured claim and unsecured deficiency claim) voted to reject the Plan. Impaired classes 4 and 5B voted to accept the Plan. Class 4 (secured tax claim) consists

solely of the Marion County Treasurer and Class 5B consists of unsecured claims (other than CWCapital's deficiency claim) totaling approximately $54,505.

Among the Class 5B creditors is Robert Gracey ("Gracey"), a business acquaintance of George, who holds a general unsecured claim of $1662.50 (the "Gracey Claim") and purchased the unsecured claims of Varsity Contractors ($4640.00), Indianapolis Water Company ($66.94) and Citizens Gas ($722.07) (the "Gracey Purchased Claims"). The Gracey Claim and the Gracey Purchased Claims voted to accept the Plan. Jeffrey Roberts ("Roberts"), an employee of TBC, filed a claim for $11,001.10 (the "Roberts Claim") and voted to accept the Plan. Hittle Landscaping ($1302.76), Mission Mechanical ($3902.88) and Hutchinson Signs ($514.98) all voted to accept the Plan. TBC also filed a claim ($25,206.50) and voted to accept the Plan, but the parties agree that this vote cannot be counted for voting purposes because TBC is an "insider" as defined under Section 101(31)(B). CWCapital purchased the claims of class 5B creditors Indianapolis Power and Light ($4678.00) and Roto-Rooter ($806.90) and voted to reject the Plan.

### C. CWCapital's Objections to the Plan

CWCapital objects to confirmation of the Plan on the basis that (1) the Debtor impermissibly separately classified CWCapital's unsecured deficiency as Class 5A to obtain the acceptance of Class 5B in order to obtain plan confirmation; (2) Class 5B does not have sufficient votes to accept the Plan as (a) the Gracey Claim and the Gracey Purchased Claims should not be counted because Gracey is an insider or agent of the Debtor, or at the least, a non-statutory insider, and that the claims were filed in bad faith, (b) the Roberts Claim is not owed by the Debtor and therefore should not be counted, and (c) certain vendor claims in Class 5B were either paid by the Debtor or were for work not done; (3) the Class 4 claim of the Marion County

Treasurer is not impaired or, in the alternative, is artificially impaired because the Plan delays

payment of interest on the secured claim by two months; (4) the Plan violates the absolute

priority rule as it allows Mary Clare, an insider, to obtain an equity interest in the Reorganized

Debtor before all general unsecured claims are paid in full and (5) the Plan was filed in bad faith.

## II. Discussion

### A.  Separate Classification of Unsecured Deficiency Claim

CWCapital filed timely proof of claim no. 7 asserting a secured claim in the amount of

$6,891,889.00 arising out of its September 16, 1999 note, mortgage, and guaranty with the

Debtor.   The Debtor bifurcated CWCapital's claim under the Plan.  The secured component is

classified in Class 1 as an impaired secured claim in the approximate amount of $4,514,896; the

unsecured deficiency is classified in Class 5A as an impaired unsecured claim in the approximate

amount of $2,376,993.00.  Class 5B consists of general unsecured claims totaling approximately

$55,000.00.

CWCapital asserts that the classification of its Class 5A unsecured deficiency claim

separately from Class 5B general unsecured claims is improper.  The Seventh Circuit has

addressed this precise issue, ruling unequivocally against CWCapital.  *In re Woodbrook Assocs.*,

19 F.3d 312 (7th Cir. 1994), the Seventh Circuit found that, "at least where the debtor is a

partnership comprised of a fully encumbered single asset, the legal rights of a § 1111(b) claimant

are substantially different from those of a general unsecured claimant." *Id*. at 319.  Accordingly,

the Seventh Circuit held that Sections 1111(b) and 1122(a) "not only permit but require separate

classification" of a Section 1111(b) unsecured deficiency claim from other general unsecured

claims.  *Id*.

CWCapital argues that the basis for *Woodbrook's* separate classification was to ensure the recourse rights of the general unsecured creditors as against the non-recourse secured lender. Because the unsecured deficiency claim in this case was converted from non-recourse to recourse upon bankruptcy, CWCapital argues that the rights of the unsecured creditors are identical and *Woodbrook's* requirement of separate classification is inapplicable. The Seventh Circuit did not decide *Woodbrook* solely because the two classes of claims in that case had different recourse rights. Instead, the holding derives from the substantial legal differences afforded the holder of a Section 1111(b) claim as opposed to a general unsecured trade creditor. First and foremost, a Section 1111(b) claim exists only in chapter 11, while general unsecured claims exist in all chapters. *Id.* Additionally, Section 1111(b) provides the holder of such a claim an opportunity to elect to treat its entire claim as an allowed secured claim, a benefit accorded no other creditor in bankruptcy.

More importantly, and without regard to recourse rights, the classification of Section 1111(b) unsecured deficiency claims together with general unsecured claims would create unintended anomalies in the application of the Bankruptcy Code:

> Section 1111(b)(1)(A)(i), which requires that a § 1111(b)(2) election be made by "the class of which such [§ 1111(b)] claim is a part," means the general unsecured creditors, included in the class, must vote on whether the § 1111(b) claimants should make the § 1111(b)(2) election. The general unsecured creditors, consequently, can block approval of the election by a majority of votes. 11 U.S.C. § 1111(b)(1)(A)(i); Fed. R. Bankr. P. 3014. Finally, general unsecured creditors, who have no lien claims, can participate in the election process because the class comprised of the § 1111(b) claimants holds collateral that is not of inconsequential value.

*Id.*

CWCapital (or, more accurately, Class 5A) did not choose to make an election under Section 1111(b)(2) prior to the conclusion of the hearing on the disclosure statement as required by Rule 3014 of the Federal Rules of Bankruptcy Procedure.  This does not alter the considerations set forth in *Woodbrook,* and does not provide a basis to ignore its holding. CWCapital had Section 1111(b)(2) rights that no other creditor in Class 5B possessed, which make the legal rights of CWCapital substantially different from and better than the rights of the vendor creditors in Class 5B.  Accordingly, while other courts may disagree, the rule in the Seventh Circuit is clear: CWCapital's unsecured deficiency claim must be separately classified from general unsecured claims.

CWCapital raised for the first time at the Confirmation Hearing that its guaranty by the Debtor of obligations under the note provide a separate basis for including CWCapital's entire claim in Class 5B.  If this position is correct, of course, CWCapital would control that class for purposes of Plan acceptance or rejection, as its claim would comprise almost the entire class amount.  CWCapital's position is incorrect.  CWCapital has one claim against the Debtor arising from its note, mortgage, and guaranty; it does not have a separate claim under each document, and to hold otherwise would allow duplicative claims against the Debtor.  Furthermore, CWCapital did not file a separate proof of claim based upon the Debtor's guaranty obligations but instead included the guaranty as an additional basis for the claim CWCapital did file. Nevertheless, *Woodbrook* controls here and the Court reiterates that *Woodbrook's* approval of separate classification was not based exclusively on the recourse rights of the unsecured creditors.  Rather, the rights afforded the lender under Section 1111(b) were rights no other unsecured creditor possessed and that distinction was sufficient to separately classify the lender's unsecured deficiency claim.  The Plan's separate classification of Class 5A is therefore proper.

### B. Class 5B Claims

#### 1.   The Gracey Claim and the Gracey Purchased Claims

Gracey [1]  is a mortgage broker who performs financing work on behalf of shopping centers that are managed by TBC (the "TBC Centers").  He has maintained a business relationship with George for the last 40 years.  He estimated that, during that time, he or individuals he supervised originated between 50 and 100 loans totaling $600 million to $700 million for the TBC Centers.   Gracey neither works for TBC nor has TBC ever paid Gracey directly.  Instead, Gracey works for and is paid by the TBC Center that owns the particular project on which he is working.  Since late 2009, Gracey has been semi-retired and doing financing work on his own.  Since late 2009, he has performed and billed approximately $60,000.00 of work for various companies owned by the TBC Centers and hopes to continue to do work for them in the future.

Prepetition, the Debtor's major tenant, Circuit City, had rejected its lease with the Debtor in its own chapter 11 case, leaving the Debtor with vacant lease space and a precarious financial condition since the Debtor's prepetition loan matured on October 1, 2009 without an agreement in place to extend it.  Given his expertise at and history of obtaining financing for the TBC Entities, Gracey was involved in locating refinancing for the Debtor, but he had no success finding prepetition refinancing.   Postpetition, Gracey made several recommendations to Joyce Bradley, Executive Vice President of TBC ("Bradley"), regarding refinancing possibilities, and a number of proposals were distributed to potential lenders.  Those efforts were similarly unsuccessful.

---

[1] Mr. Gracey did not appear as a witness at the Confirmation Hearing.  The parties stipulated to the admission of his deposition taken by CWCapital on November 9, 2010.

Once it became evident that the Debtor could not obtain refinancing, the Debtor considered its alternatives. Bradley and Gracey first spoke about the possibility of the Debtor's bankruptcy in December 2009. Even as of this point, Gracey had an understanding of the claims purchasing and plan voting process. Bradley advised Gracey that CWCapital had made clear its intention to purchase claims in the Debtor's bankruptcy case. The evidence at the hearing clearly indicated that Gracey volunteered to help the Debtor any way he could and that it was Gracey who suggested that he purchase claims in the bankruptcy, without solicitation to do so from either Bradley or George. The protocol eventually adopted was that Gracey would communicate with TBC regarding the purchase of claims; TBC would communicate with Debtor's counsel regarding Gracey's intentions; Debtor's counsel would communicate with various creditors and report back to TBC regarding the status of claims purchases; and TBC would follow up with Gracey.

Gracey timely filed his own claim in the amount of $1,662.50 for prepetition services performed by him for the Debtor. The services were itemized in a January 18, 2010 invoice attached to the claim. Gracey testified that he prepared that invoice and that he routinely prepared invoices for work performed for the TBC Centers in the regular course of his business, but "not as often" or as diligently as he should. With respect to the invoice attached to Gracey's claim, Bradley testified that TBC gathered the relevant information and prepared the invoice for Gracey sometime in June 2010. Gracey testified that he has not been paid any of the amount reflected on the invoice.

Gracey also purchased and filed claims for Varsity Contractors, Inc. ($4640), the Indianapolis Water Company ($66.94) and Citizens Gas ($722.07) (previously referred to as "the Gracey Purchased Claims") all of which had been assigned to him. TBC advanced $722.07 to

10

purchase that Citizens Gas claim on behalf of Gracey, and Gracey subsequently reimbursed TBC for that payment.  However, the Debtor's funds were not used to purchase the Citizens Gas Claim.  All of the checks issued by Gracey to purchase claims were made out directly to the claim holder, with the exception of the check made out to "cash" that he issued to reimburse TBC for the purchase of the Citizens Gas Claim.

CW Capital argues that the Debtor paid Gracey to purchase and file claims and points to two separate emails that reference amounts paid to him.  The first email was introduced as Exhibit DD and was a March 15, 2010 email from Bradley to Gracey indicating that he was owed $7,100 for services he performed for various TBC Centers.  Among the services outlined in the email was $1000 for "Greenwood Point unsecured creditor purchase".  From the contents of the email, it appears that the $7,100 figure was arrived at by computing the amount owed for services rendered  ($10,000), deducting from that the amount already paid to Gracey ($7500) and then adding $4600 after which appeared the notation "less GPT check".  (Bradley testified that "GPT" are the initials that TBC uses for the Debtor, but she could not remember what this related to and that it may have been a typo.)  From this email, CW Capital argues that Gracey indeed was paid $1000 to purchase and file claims and was later reimbursed $4600 by the Debtor for purchasing the Varsity Contractors claim (although that claim was filed in the amount of $4640) since that claim had been the only claim purchased by Gracey as of that point.

Bradley testified that the $7,100.00 payment was in fact made, but was not sure how it had been allocated, but that it would have been allocated between the other TBC Centers listed in the e-mail, with the exclusion of the Debtor and TBC.  Nor did she remember what "$4,600.00 GPT check" referred to even though she authored the email.

The second email was Exhibit FF, the last page of which was a June 25, 2010 email from Bradley to Gracey. The email instructs Gracey to resubmit his bill for $16,000 worth of work done for Washington Shoppes, a TBC Center. Gracey did resubmit his Washington Shoppes bill, and added by writing in by hand $1,000 for expenses, which amount was subsequently paid. Bradley did not remember what the $1000 increase related to, but CW Capital contends that it was for the purchase of the Citizens Gas Claim, an amount roughly equivalent to the $722.07 claim and one hour of Gracey's time at $350.00 per hour.

Whatever CW Capital reads into these emails, the fact remains that they were emails initiated by Bradley, not Gracey. There was ample evidence that Gracey was slow to communicate to TBC his time for services rendered and that the only reimbursement he expected was that for services rendered to the TBC Centers, not for his purchase of claims.

CW Capital also notes that TBC intended to reimburse Gracey for the difference between the 15% distribution provided for in the Plan and the 100% he paid for the Gracey Purchased Claims. Bradley testified as much at her deposition but later indicated at trial that her deposition testimony was incorrect and that any payments would be allocated to another entity under the umbrella of TBC. Furthermore, Gracey testified that no one has ever told him he would be paid back and that there was no understanding that he would be. Bradley testified that she had discussions with George about making Gracey "whole" but that she has never had those conversations with Gracey and that Gracey never asked to be reimbursed.

Furthermore, CW Capital's suggestion that the Debtor must have promised to make Gracey whole seems a bit ludicrous given the meager amount of Gracey's loss. Gracey paid a total of $5,429.01 to purchase the Gracey Purchased Claims, of which $814.35 (15%) would be paid through the Plan. The balance of $4,614.66 is hardly a significant outlay of cash and the

Court surmises that such a sum would not have had a remarkable effect upon Gracey's financial well being.  Given the history of the financial dealings between Gracey and the TBC Centers, and the potential for future business, Gracey's testimony is certainly credible that he did not expect to be made whole regarding the claims he purchased.

The Court is convinced that Gracey is not an insider of the Debtor.  It was Gracey's idea to purchase claims, without solicitation or coercion by the Debtor.  Both Gracey and Bradley testified that Gracey and the Debtor had no agreement, written or otherwise, to purchase claims. There was ample evidence that Gracey's motivation in purchasing claims was purely economic as he wished to preserve the business relationship he had established with the TBC Centers. Gracey's entire history of obtaining financing had been with the TBC Centers and not TBC. When he was asked why he purchased claims in the bankruptcy, both Gracey and Bradley testified that it was in Gracey's and the unsecured creditors' best interests for the Debtor to reorganize and avoid the Property from being foreclosed.  Furthermore, a viable Debtor would enable Gracey to do future business with the Debtor.  Gracey further testified that, if given the chance, he would not sell his claims and voting rights to CWCapital because he bought the claims in order to vote them, and to enable the Debtor to "survive so [he] can keep a client in the future."  He acknowledge that he did not negotiate the price he paid for the Gracey claims, but that he paid full price for them because  he hoped to get future assignments on other TBC Centers, testifying that "you have to put some fertilizer down for a client," and "they've been a loyal client of mine for 40 years, you know, it's not all about the money."  Gracey's interest in the Debtor was purely from the standpoint of preserving a source of business revenue and he did not expect to play a role in the operation or management of the reorganized Debtor.  Although Bradley kept track of his time and hours worked (including the time expended in purchasing

claims) it was Gracey who approved the time and submitted the invoices and he neither requested payment nor submitted an invoice for anything other than services performed for the TBC Centers, and certainly not for the purchase of claims.  If and when the Debtor attempted to refinance the CWCapital postpetition secured note, Bradley testified that it intended to use Gracey to perform that work.  Considering that Gracey had placed between $600 and $700 million in loans for the TBC Centers, and most likely would be given the opportunity in the future to obtain refinancing for the Debtor, $5,429.01 was a pauper's sum for Gracey to pay in order to preserve a business relationship. Gracey and George  have enjoyed a 40-year business acquaintance, but their relationship remained primarily business and only "very occasionally" did they socialize.  While neither the Debtor nor an insider may purchase claims for the purpose of controlling the plan process, that has not happened here.

CWCapital also argues that Gracey is a non-statutory insider under Section 101(31) and that all of the Class 5B votes he cast cannot be counted in determining class acceptance.  For purposes of cram-down under Section 1129(a)(10), impaired class acceptance is "determined without including any acceptance of the plan by any insider."  It is uniformly accepted that the list of "insiders" set forth in 11 U.S.C. § 101(31) is not exhaustive, and that the section is "illustrative rather than exhaustive."  *In re Krehl*, 86 F.3d 737, 741 (7th Cir. 1996).  The relevant inquiry is into the closeness of the relationship between the parties, and whether the transactions at issue were conducted at arm's length.  *Id*. at 742 (citations omitted).  "In determining the closeness of the relationship, courts have found the essential question is 'the degree to which the transferee is able to exert control or influence over the debtor.'  Although actual control does not have to be shown, there must be something more than 'the mere existence of a friendship.'"

*Stanger v. Miller (In re Miller Homes, LLC),* Case No. 05-60213/GMB, 2009 Bankr. LEXIS 3907, at *21-22 (Bankr. D.N.J. Nov. 25, 2009) (citations omitted).

Despite the lengthy 40 year business relationship, nothing in the record indicated that Gracey was able to exert substantial control over the Debtor such that it was Gracey who directed the Debtor to do indirectly (purchase claims) what it could not do directly.  Similarly, nothing in the records suggests that Gracey was a mere pawn of the Debtor who blindly did the Debtor's bidding.  The relationship between he and George, although cordial, was primarily business with only an occasional social contact.  Importantly, Gracey had not played a role in the operation or management of the Debtor and did not expect to do so with the Reorganized Debtor, and the evidence does not suggest otherwise.  Accordingly, the Court holds that Gracey is not a non-statutory insider of the Debtor, and the Gracey Claim and the Gracey Purchased Claims may be tabulated for purposes of Class 5B acceptance and cram-down under Section 1129(a)(10).

CWCapital asserts that Mr. Gracey be designated under 11 U.S.C. § 1126(e), and that the Court not count his Plan acceptance votes with respect to the Gracey Claims.  Section 1126(e) provides that, "On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."  "In this context, designate means disqualify from voting." *Figter Ltd. v. Teachers Ins. & Annuity Assoc. of Am. (In re Figter Ltd.)*, 118 F.3d 635, 638 (9th Cir. 1997).  Because the "ability to vote on a reorganization plan is one of the most sacred entitlements that a creditor has in a chapter 11 case," *In re Adelphia Communications Corp.*, 359 B.R. 54, 56 (Bankr. S.D.N.Y. 2006), designation is a drastic remedy that is the exception rather than the rule. *Id.* at 61.  Accordingly, the burden on the objecting creditor to sustain designation is heavy, and "a movant must

demonstrate more than a mere selfish motive on behalf of a voting party in order for a court to designate that party's vote." *Id. See also In re United Marine, Inc*., 197 B.R. 942, 947 (Bankr. S.D. Fla. 1996).

Gracey's use of Debtor's counsel to document the purchase and the filing of the Gracey claims does not demonstrate bad faith on Gracey's part. CWCapital had announced its intentions to purchase claims in an effort to block confirmation. Gracey was aware that time and accuracy was of the essence. Gracey resided in Florida and did not see the need to hire separate counsel to draft and file nondescript documents such as claim assignments, claim transfers and proofs of claims. It was Gracey's idea to purchase claims as he had prior knowledge of the claims purchase and voting process. It was Gracey, and not Debtor's counsel, that took the lead in approaching the creditors or negotiating the purchase price of their claims. At most Debtor's counsel acted as liaison only after Gracey made his intentions known that he wished to purchase claims. Gracey acted with legitimate business and economic reasons. [2] It has been repeatedly held that purchasing claims for the purpose of protecting an existing claim or interest is not a basis for designation under 11 U.S.C. § 1126(e). *See, e.g., In re Gilbert,* 104 B.R. 206 (Bankr. W.D. Mo. 1989); *Figter*, 118 F.3d at 638. When a creditor "sufficiently manifests" an intent that does not indicate bad faith, "the Court will not hazard to second-guess the wisdom of that creditor's business judgment as displayed by his voting decision. As long as a creditor acts to preserve what he reasonably perceives as his fair share of the debtor's estate, bad faith will not be attributed to his purchase of claims to control a class vote." *Gilbert*, 104 B.R. at 216-17 (citation omitted).

---

[2] It appears that Gracey was not the only creditor that voted in favor of the Plan and a 15% distribution on his claim in order to preserve an existing business relationship. Mission Mechanical, Inc, Hutchinson Signs, and Hittle Landscaping are class 5B creditors and filed claims on their own. (see discussion regarding "Vendor Claims", *infra).* It was no secret that CWCapital offered payment in full to purchase Class 5B claims, yet these three claimants, too, voted for the Plan.

"Good faith" is not defined in the Bankruptcy Code, and the scope of this provision has therefore been left to interpretation. Based on Supreme Court guidance, courts have held that this term is intended "to prevent creditors from using 'obstructive tactics and holdup techniques' to secure either some unfair advantage through the plan's acceptance or rejection, or perhaps preferential treatment for the price of their vote." *Id* at 215, (quoting *Young v. Higbee Co.*, 324 U.S. 204, 210-11 (1945)). As such, good faith does not require "selfless disinterest," and the test "is whether a creditor has cast his vote with an 'ulterior purpose' aimed at gaining some advantage to which he would not otherwise be entitled in his position." *Id*. As stated by the Ninth Circuit, "we do not condemn mere enlightened self interest, even if it appears selfish to those who do not benefit from it." *Figter*, 118 F.3d at 639 (citation omitted). Creditors therefore are not expected to "approach reorganization plan votes with a high degree of altruism and with the desire to help the debtor and their fellow creditors." *Id*. Gracey was not an insider of the Debtor, was not a non-statutory insider of the Debtor and did not purchase and file the Gracey Claims in bad faith. Accordingly the Gracey Claim and the Gracey Purchased Claims that voted in favor of the Plan will be counted.

### 2. *The Roberts Claim*

TBC, as property manager, is responsible for finding tenants for the Debtor's shopping center. TBC, in turn, uses leasing representatives to find tenants or retain existing ones and to negotiate leases. The leasing representatives do not enter into contracts with the property owners when they are assigned to a property and property owners have absolutely no authority to hire or fire leasing representatives. Rather, leasing representatives work for TBC as either employees or independent contractors.

17

Roberts is employed by TBC as a leasing representative, and is assigned to various TBC Centers at the direction of TBC.  Only TBC can switch Roberts' property assignments.  Roberts has no written employment contract with TBC but TBC provides Roberts a W-2 at the end of the tax year.  Roberts is currently assigned as leasing representative for six TBC Centers managed by TBC, including the center owned by the Debtor.  (These six TBC Centers to which Roberts has been assigned will be referred to as "the Roberts Centers").  Roberts has been assigned to the Debtor's shopping center for approximately three years.

TBC pays its leasing representatives on commission.  Under the Management Agreement, the Debtor is obligated to pay commissions earned by *TBC*  in the performance of its management duties.  TBC further divides the commissions paid to it by the Debtor between "house commissions" (commissions kept by TBC) and "broker commissions" (commissions paid by TBC to its  leasing representative responsible for obtaining the tenant and negotiating the lease).  When TBC receives a commission, a "Commission Statement" is prepared, reflecting both the "house commission" and the "broker commission".

TBC pays Roberts monthly, based on an annual draw of $100,000.00.  TBC offsets the monthly advances made to Roberts with the broker commissions that he earns.  Until Roberts surpasses $100,000.00 in commissions earned, TBC keeps the full amount of the commission and credits the commission against the draws received by Roberts.  To the extent the total commissions earned by Roberts in a year exceed Roberts' $100,000 draw, TBC pays Roberts the full amount of those broker commissions earned over and above his annual draw.  Roberts has exceeded the $100,000 annual draw each year he has worked for TBC as a leasing representative.

Roberts negotiated a lease renewal with Michaels Stores, Inc. ("Michaels") in June 2009. When the actual lease renewal became effective on March 1, 2010, the Debtor became liable to TBC for the commission as provided for under the Management Agreement. The total commission for the Michaels lease renewal was 3% of the five-year rental income, or approximately $33,003.00. Roberts negotiated with *TBC* for a broker's commission of 1%, or $11,001.00 and TBC was to receive the remaining 2%, or $22,002.00 as the house commission (both the "broker commission" and the "house commission" earned on the Michael's lease renewal will be collectively referred to as "the Michaels Commission"). [3]

The Michael's lease renewal became effective in March, 2010, and Roberts had not exceeded his $100,000 draw when he earned his share of the Michael's Commission. Although the Debtor did not pay TBC the Michael's Commission, TBC nevertheless credited Roberts' share of the Michael's Commission against his $100,000 draw. From the testimony at the hearing, it appeared that this was the first time a TBC Center (the Debtor) for whom TBC procured a tenant failed to pay TBC its commission as provided for under the Management Agreement. Given this first-time occurrence, it was no surprise that Roberts testified that he did not know what would happen if a "shortfall" occurred, i.e, he earned less than his annual draw, or if TBC was paid less in commissions than his annual draw. Bradley testified that there was no agreement between TBC and its leasing representatives for TBC to pay the shortfall. She also testified that, if the shortfall was minimal, TBC could decide to carry the shortfall forward to the next year and have the leasing representative pay the shortfall back out of future commissions. If the shortfall was too large, TBC could decide to terminate the leasing representative. However,

---

[3] The Broadbent Company also timely filed a proof of claim in the amount of $25,206.50, which included $22,002.00 for its share of the Michael's Commission.

this line of testimony is relevant only if Roberts had exceeded his $100,000 draw when he earned his portion of the Michaels' Commission, and he had not.

Nonetheless, the Debtor argues that Roberts has a claim against it for his share of the Michael's Commission.  Perhaps the Debtor is proceeding on the theory that (1) Roberts will not be paid his share of the Michael's Commission if he exceeds his $100,000 draw; (2) Roberts will be required to pay a shortfall for his share of the Michael's Commission that was credited to his $100,000 draw but not paid to TBC by the Debtor or (3) the Debtor's failure to pay the Michael's Commission to TBC gives Roberts a claim against the Debtor since Roberts will be denied his share of the Michael's Commission. Given the relationship that exists between TBC, Roberts and the Debtor, the Court finds that Roberts does not have a claim against the Debtor.

First, clearly there is no agreement in place between *Roberts and TBC* that Roberts would not be paid his share of an *earned* commission if the Debtor failed to pay TBC its commission under the Management Agreement.  Roberts is an employee of TBC.  His job is to secure leases in the Roberts Centers owned by George.  When Roberts leases space in one of the Roberts Centers,  he has performed the job that he was hired to do.  The Court believes that Roberts would have a right to a credit for his share of the *earned* commission regardless whether TBC was paid.  This is particularly true given the fact that, as of the petition date, the Roberts Centers and TBC were all owned by George.  The only commissions that could ever be earned by Roberts would come from commissions earned by leasing space in one of the Roberts' Centers. The argument that Roberts would not be paid his share of a commission that had been *earned* by leasing space in one of the Roberts' Centers because it had not paid TBC strains credibility, particularly given Roberts' successful employment history with TBC.  And, the scenarios of what would happen if a shortfall occurred are equally unlikely from happening.  Given the

common ownership among the Roberts Centers and TBC,  it is doubtful that (1) TBC would

carry the shortfall forward to the next year and have Roberts pay the shortfall back out of future

commissions or (2) if the shortfall, under these circumstances, was large, TBC would terminate

Roberts' employment.   The concept of  "shortfall" regarding commissions would seem more

appropriate where the leasing agent does not perform to expectations and fails to rent space; *not*

situations where the leasing agent performs his duties and earns commissions but does not get

paid because the shopping center fails to pay the commission.  In other words, it is highly

unlikely that George  (via TBC) would terminate the employment of a historically high

performing employee (Roberts)  because a TBC Center (the Debtor) failed to pay a TBC.  Given

the unusual facts concerning commissions in this case, it is no wonder that there was never any

agreement about payment of commission *earned* but not paid to TBC.  As noted above, this was

a first-time occurrence and the Court surmises that  no one contemplated that one entity owned

by George Broadbent would fail to pay another entity also owned by George Broadbent.  Thus,

the Court believes that Roberts would receive a credit for any earned commission and indeed, in

this case, that credit was given to him against his draw.

Second, even if this analysis is incorrect, Roberts still does not have a claim against the

Debtor because nothing in the Management Agreement between the *Debtor and TBC:* (1)

obligates the Debtor to pay TBC's leasing representatives directly; (2) provides for payment by

the Debtor to the leasing representatives in the event they have not been paid by TBC; or (3)

makes the payment of a leasing representative's commission contingent on the Debtor paying

TBC.  TBC's protocol in invoicing and paying commissions to its leasing representatives bears

this out.  With respect to Roberts' share of the Michael's Commission, a commission statement

was prepared on or about June 23, 2009 reflecting a "house commission" of $22,002 and a

"broker commission" of $11,001.  Roberts prepared the "broker's commission" portion of the

commission but did not prepare the "house commission" portion.  When asked by the Court

whether TBC billed the Debtor only for its house commission or for the entire commission,

Bradley replied the entire commission.  Thus, Roberts did not bill, nor had he ever billed the

Debtor for the amount of his broker's commission.  At the time Roberts earned his share of the

Michael's Commission, he had not surpassed his $100,000.00 draw, and even if he had, the

entire 3% commission would be payable to TBC by the Debtor;  it was up to TBC to pay the 1%

commission to Roberts.

Roberts was told in June 2010 that his commission for the Michaels lease renewal would

be "involved" in the Debtor's bankruptcy.  As of the Petition Date, the Debtor had not paid TBC

the commission.  Roberts filed his claim for $11,001 even though the Debtor had not scheduled

Roberts as a creditor.  Counsel for the Debtor prepared Roberts' proof of claim, and Roberts

reviewed and signed the proof of claim.   Attached to Roberts' proof of claim was an invoice

setting forth calculations only for the broker's commission, with the notation at the bottom

reading "MAKE ALL CHECKS PAYABLE TO: Jeffrey Roberts", as well as the June 23, 2009

commission statement.   Roberts did not prepare the invoice nor had he ever seen that type of

document before.  He testified that he did not know why it was attached to his proof of claim and

did not instruct anyone to put the language, "Make all checks payable to: Jeffrey Roberts" on

that document.

The Court agrees with CW Capital that Roberts' claim is not owed by the Debtor.

Roberts is not in privity with the Debtor and does not have a claim against it.  The only party to

whom the Debtor is indebted is TBC under the Management Agreement, not Roberts.  Roberts is

neither an employee of the Debtor nor does he have any agreement with the Debtor, written or

oral, regarding the payment of his broker's commission. Roberts understood that leasing representatives were never paid commissions directly by the property owners, and Roberts has never received a commission check from the Debtor, or any other Roberts Center for which he negotiated a lease. While TBC has a claim against the Debtor for these amounts, Roberts does not.

The Court is mindful that a "creditor" who has a "right to payment" under the broad definition of "claim" is not limited only to those with contractual relationships with the debtor. *In re S. Beach Sec., Inc.,* 606 F.3d 366, 376 (7th Cir. 2010) (citations omitted) (a creditor includes "anyone who has a claim against the debtor, which is defined broadly to as any right to payment; it needn't be a claim arising from a contractual relation with the debtor."). The Debtor argues that Roberts has a claim for unjust enrichment because the Debtor is the beneficiary of Roberts' work in renewing the Michael's lease and continues to reap the benefits of the revenue generated by the lease. Such an equitable remedy is appropriate, argues the Debtor, as Roberts' agreement with TBC is that he is not entitled to payment of commissions until TBC receives payment from the property owner leaving him without a remedy at law.

The Management Agreement does not provide that payment of Roberts' commission was contingent upon the Debtor's payment of commissions to TBC, and the Debtor has not produced any written document that so provides. Thus, the Court is not convinced that Roberts is without a remedy at law. Regardless, Roberts share of the Michael's Commission was earned at a point where Roberts had not exceeded his $100,000 draw. Even had the Debtor timely paid TBC the commission, TBC would not have paid Roberts his portion of the Michael's Commission; it would have credited the commission to his $100,000 draw. TBC in fact so credited Roberts'

draw and Roberts received everything to which he was entitled under his employment arrangement with TBC.

A claim for unjust enrichment can come about when one provides value to another but has not been paid for the value provided. Roberts only had a right to a credit for his commission against his $100,000 draw. Roberts' right only to a credit against his draw, and not a check, explains why he did not recognize the language "make all checks payable to Jeffrey Roberts" on the invoice attached to his claim; he would not have received a check in this situation. Roberts only had a right to his draw and there is nothing in the record that he did not receive his draw. Thus, Roberts was paid everything to which he was entitled. Since he had not exceeded $100,000 in commissions, he would have received only a credit. Roberts has no claim for unjust enrichment and his claim is disallowed.

### 3. *Class 5B Vendor Claims*

CWCapital objected to claims filed by class 5B claimants Mission Mechanical, Hutchinson Sign, and Hittle Landscaping (the "Vendor Claims"), all on the basis that they were unenforceable against the Debtor either because the work giving rise to the claim had not been performed or the claim had been paid prepetition. The Vendor Claims voted in favor of the Plan. As of the commencement of the confirmation hearing, no responses had been filed to CWCapital's objections. At the confirmation hearing, the Debtor orally moved to temporarily allow the Vendor Claims under Fed. R. Bankr. P 3018(a) for the purpose of accepting the Plan. CWCapital withdrew its objection to the Hittle Landscaping Claim.

Mission Mechanical, Inc. ("Mission Mechanical") filed timely proof of claim no. 11 in the amount of $3,902.88 (the "Mission Mechanical Claim") for water main leak repair and HVAC work. Attached to the Mission Mechanical Claim were two invoices and a work order.

The invoice for work done on the HVAC system ($1163.85) was for work done for the Debtor prior to the Petition Date.  The invoice was paid postpetition by the Debtor by mistake.  Upon request, Mission Mechanical returned the money.  Debtor's Exhibits 12 and 13 showed the return of the payment by Mission Mechanical and the deposit of those funds into the Debtor-in-possession bank account.   The other invoice for work water main leak repair in the amount of $2739.01 noted a "preferred customer discount" of $465.63, leaving a reduced balance owed of $2273.38.   However, the "$2273.38" figure was crossed out and replaced in handwriting with the original sum of "$2739.01" followed by an asterisk noting "Preferred Customer Discount lost as a result of failure to promptly pay invoice".

Michael Arbuckle, Vice President and General Manager of Mission Mechanical, testified that Mission Mechanical gives a preferred customer discount on invoices for work done if the invoice is paid by the customer within thirty days.  If the customer does not timely pay the invoice, the preferred customer discount is null and void.  TBC has a long history with Mission Mechanical of timely paying the invoices for work done at the properties it manages and thus it is a preferred customer.  The Debtor, however, was not entitled to the discount on the invoice attached to the Proof of Claim filed by Mission Mechanical because that invoice was not timely paid.  Arbuckle testified that the sum of $3902.88 remains unpaid.

Hutchinson Signs & Electrical Co., Inc. ("Hutchinson Signs") filed timely proof of claim no. 13 in the amount of $514.98 (the "Hutchinson Signs Claim") for prepetition repair work to a sign at the Debtor's shopping center.  The invoice was paid postpetition by the Debtor by mistake.  Phillip Weiss, regional property manager for TBC, testified that after performing preliminary work, Hutchinson Signs informed him that the sign was in need of additional work.

25

Weiss planned to have the additional work performed by Hutchinson Signs, but stopped the additional work because of the Debtor's anticipated bankruptcy filing.

Scott Powell testified that he is an assistant comptroller for properties managed by TBC. In his work for TBC, Powell handles the day-to-day accounting functions and operations of the retail shopping centers. Powell testified that the Hutchinson Signs prepetition invoice in the amount of $514.98 was marked "paid" because it mistakenly had been paid postpetition by Greenwood Place, another TBC Center, and not the Debtor.  When the payment was returned, TBC requested a replacement invoice for that work. Debtor's Exhibit 11 showed the return of the $514.98 payment by Hutchinson Signs to the Debtor.

The evidence establishes that the Mission Mechanical Claim and the Hutchinson Signs Claim are valid claims against the estate in that the work giving rise to each of those claims was performed.  Those claims remain unpaid.  Accordingly, the Court grants the Debtor's motion under Rule 3018(a) for temporary allowance, and hereby temporarily allows the Mission Mechanical Claim and the Hutchinson Signs Claim in the amounts set forth in their respective claims for the purpose of plan voting.

The Court concludes that sufficient votes were cast in favor of the Plan by the claimants in Class 5B, an impaired class, and therefore the Debtor has the requisite impaired accepting class needed for confirmation under Section 1129(a)(10) as calculated below:

| Creditor's Name | Ballot Amount | Ballot Amount Excluding Claims of All Property Services, The Broadbent Company, and Roberts | For | Against |
|---|---|---|---|---|
| Indianapolis Power & Light Co. | $4,678.90 | $4,678.90 | | $4,678.90 |
| Roto Rooter-Indianapolis | $806.90 | $806.90 | $806.90 | |
| Varsity Contractors, Inc., Indianapolis, IN | $4,640.00 | $4640.00 | $4640.00 | |
| Hittle Landscaping, Inc. | $1,313.21 | $1313.21 | $1,313.21 | |

| | | | | |
|---|---|---|---|---|
| Indianapolis Water Company | $66.94 | | $66.94 | $66.94 | |
| Citizens Gas & Coke Utility | $722.07 | | $722.07 | $722.07 | |
| Robert Thomas Gracey | $1,662.50 | | $1,662.50 | $1,662.50 | |
| Mission Mechanical, Inc. | $3,902.86 | | $3,902.86 | $3,902.86 | |
| Jeffrey Roberts | $11,001.00 | (disallowed) | | | |
| Hutchinson Signs & Electrical Co., Inc. | $514.98 | | $514.98 | $514.98 | |
| All Property Services | $87.50 | (insider) | | | |
| Republic Waste Services | $34.90 | | $34.90 | | $34.90 |
| The Broadbent Company | $25,206.50 | (insider) | | | |
| **TOTAL** | **$54,638.26** | | **$18,343.26** | **$13,629.46** | **$4,713.80** |

Percentage accepting for purposes of Section 1129(a)(10):     **74.3%**

### C.  Class 4 Claim – Secured Tax Claim of the Marion County Treasurer

The Debtor does not need the accepting vote of Class 4 to get its Plan confirmed, but the

Court feels compelled to address this issue.  The Marion County Treasurer filed timely proof of

claim no. 5 asserting a secured claim in the amount of $155,284.74, plus interest at 8%, (the

"Secured Tax Claim") and voted to accept the Plan.  The Secured Tax Claim arises from real

property taxes assessed in 2009 against the Debtor's real estate.  Without intervention of the

Debtor's bankruptcy, the Secured Tax Claim would have been due in two installments, in May

and November 2010.  Pursuant to Indiana Code Section 6-1.1-22-13, real property taxes are

secured by a lien that attaches on the assessment date of the year for which the taxes are

assessed.  The lien of the Marion County Treasurer therefore arose and attached in 2009.

Under the pre petition loan documents, the Debtor was required each month to pay 1/12

of the estimated property taxes and insurance premiums to become due for the year to an escrow

account (the "Escrow Account") held by CWCapital.  The Escrow Account funds were

earmarked *only* for payment of taxes, insurance premiums, tenant improvements and certain

deferred maintenance.  Pursuant to the Plan, the principal amount of the Secured Tax Claim will

be paid on the Distribution Date from the Escrow Account and the interest portion of the Secured

Tax Claim (approximately $12,400.00) will be paid in three equal monthly installments, with the first installment paid on the Distribution Date and subsequent installments paid on the first day of each consecutive month thereafter for two months.  Bradley testified that the Escrow Account does not have enough money to pay both real estate taxes and interest and therefore the interest was being paid from proceeds generated in the first two months after plan confirmation.   In addition, under Section 5.4 of the Plan, "on the Effective Date, all of the assets, properties, and rights of the Debtor of every type and description, tangible, intangible, wherever located, shall be transferred and automatically vest in the Reorganized Debtor free and clear of all liens." Accordingly, the Marion County Treasurer will lose its statutory lien prior to full payment of its claim.

CWCapital  lodges two arguments why the Marion County Treasurer's vote should not be counted for purposes of achieving a consenting impaired class under Section 1129(a)(10). First,  CWCapital argues that the Marion County Treasurer's claim is *not impaired* because it is receiving at least as good, if not better, treatment than the statutory scheme for payment of secured tax claims under Section 1129(a)(9)(D).  If payment of a class of claims in accordance with Section 11129(a)(9)(D) is enough to deem that class "unimpaired", then quicker payment to and better treatment of that class surely is equally – if not more so—"unimpaired".  Second, CWCapital argues that the Debtor has "*artificially impaired*" Class 4 by spreading interest payments out over three months when the Debtor in fact has funds on hand to pay the Secured Tax Claim in full on the Distribution Date.

### 1. Classification, Impairment and Section 1129(a)(9)(D)

CWCapital asserts that treatment of a tax claim under Section 1129(a)(9)(D) renders the claim unimpaired (as opposed to artificially impaired) as a matter of law, and a plan that

proposes to treat a tax claim more favorably than that required by Section 1129 cannot transform it into an impaired claim.  In making this argument, CWCapital relies on cases analyzing the classification and treatment of unsecured priority tax claims under Section 1129(a)(9)(C).

Generally, classification of claims is covered in Section 1122, which provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class."  11 U.S.C. § 1122(a).  A debtor "possesses considerable, but not complete, discretion to classify claims and interests in its Chapter 11 plan of reorganization."  *Woodbrook,* 19 F.3d at 317.  While considerable, that discretion seems to be limited at least with respect to unsecured priority tax claims.  Section 1123(a)(1) provides that a plan shall "designate, subject to section 1122 of this title, classes of claims, *other than claims of a kind specified in section* 507(a)(2), 507(a)(3), or *507(a)(8)* of this title, and classes of interests."  Thus, this language appears to prohibit, or at the very least, limit, a plan proponent from classifying Section 507(a)(8) *unsecured priority tax claims* under Section 507(a)(8) but *not* the Secured Tax Claim here which does not fall under Section 507(a)(8). In fact, Section 1123(a)(1) says that the Debtor is required to classify this claim (since it is not a Section 507(a)(8) claim).  And, unless the holder of the secured tax claim agrees to a different treatment, the proposed treatment must be at least as favorable as that set forth in Section 1129(a)(9)(D), which provides for the same treatment as treatment of unsecured priority tax claims under Section 1129(a)(9)(C).

Section 1129(a)(9)(C), along with Section 511, provides that, except to the extent that the holder agrees to a different treatment, that section requires a plan to satisfy a Section 507(a)(8) unsecured priority tax claim by making regular installment payments over no more than five years in an amount equal to the allowed amount of the claim which includes interest payable at

the applicable rate under nonbankruptcy law.  Because the Code sets forth this minimally acceptable statutory treatment for unsecured priority tax claims for confirmation, several courts have found that such claims cannot be impaired and therefore "are not entitled to vote on a plan of reorganization."  *In re Equitable Dev. Corp.*, 196 B.R. 889, 893 (Bankr. S.D. Ala. 1996).  *See also Boston Post Road Ltd. P'Ship v. Fed. Deposit Ins. Corp. (In re Boston Post Road Ltd. P'Ship)*, 21 F.3d 477, 484 (2d Cir. 1994) (tenant security deposit claims under Section 1129(a)(9)(A); *Principal Mut. Life Ins. Co. v. Lakeside Assocs., L.P. (In re DeLuca)*, 194 B.R. 797, 806 (Bankr. E.D. Va. 1996); *In re Union Meeting Partners*, 165 B.R. 553, 568-69 (Bankr. E.D. Pa. 1994); *In re Sullivan*, 26 B.R. 677, 678 (Bankr. W.D.N.Y. 1982);  *Pennbank v. Winters (In re Winters)*, 99 B.R. 658, 663-64 (Bankr. W.D. Pa. 1989)(if "the priority tax creditors agree to a treatment other than what they are entitled to, they are not impaired.  Similarly, if the priority tax creditors are paid in full as required by § 1129(a)(9)(C), then they are also not impaired.  In either situation, the priority tax creditors are presumed to have accepted the plan because the claims are not impaired.")  *See also, In re Snedaker,* 32 B.R. 29, 30 (Bankr. S.D. Fla. 1983).

This position is not universal, however and appears to collide headfirst into the Code's definition of "impairment" in Section 1124(1).  That section broadly defines "impairment" and provides that a class of claims is impaired *unless* "the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest".  The Seventh Circuit has stated that the "standard for impairment is very lenient and 'any alteration of the rights constitutes impairment even if the value of the rights is enhanced.'" *In re Wabash Valley Power Assoc., Inc.,* 72 F.3d 1305, 1321 (7th Cir. 1995) (quoting 5 COLLIER ON BANKRUPTCY ¶ 1124.03[1] (15th ed. 1994)).  It has been held that Section 1129(a)(9)(C) by

its terms impairs a priority tax claim because the "installment payment of the tax claims eliminates the cash-payment provision, and it alters the tax claimant's rights to levy upon or put tax liens against the debtor's property in pursuit of an earlier payment of the tax claim." *In re Perdido Motel Group, Inc.*, 101 B.R. 289, 293 (Bankr. N.D. Ala. 1989).

In *Perdido Motel*, the debtor separately classified priority unsecured tax claims and proposed to treat them as set forth in Section 1129(a)(9)(C). That class of tax claims voted in favor of the plan and the debtor argued that said class constituted the necessary "impaired" accepting class needed for confirmation. The court there acknowledged that the claims were indeed "impaired" under Section 1124 even though they received the statutory Section 1129(a)(9)(C) treatment. However, because such priority unsecured tax claims could not be "classified" under Section 1123, the debtor failed to meet the Section 1129(a)(10) requirement of an impaired accepting "class" and therefore the court denied confirmation. *Id.* at 293-94. Thus, confirmation was denied not because the tax claims were not "impaired", it was denied because the tax claims could not constitute a "class" and without an impaired accepting "class", the debtor could not meet the Section 1129(a)(10) requirement.

We have no such problem here. Unlike Section 507(a)(8) claims involved in the Section 1129(a)(9)(C) cases discussed above, Section 1123(a)(1) does not prohibit the classification of the Secured Tax Claim here. In this case, absent the Debtor's bankruptcy, the Marion County Treasurer was entitled to payment of the Secured Tax Claim in two installments in May and November 2010, and to penalty and interest thereafter. Had the Debtor treated the claim in accordance with Section 1129(a)(9)(D), it would have been paid in regular installment payments over no more than five years. To suggest that this Congressionally-allowed treatment does not impair the rights of the Marion County Treasurer is directly in conflict with Section 1124(a)

because "'impairment' is not a question of how favorably a claim is treated by the plan but is a statutory question under 11 U.S.C. § 1124." *Id*.   While the proposed payment of the Secured Tax Claim under the Revised Plan is more favorable than that set forth in Section 1129(a)(9)(D), it still alters the payment rights of the Marion County Treasurer with respect to its claim.  Under the Seventh Circuit's standard of impairment, the Secured Tax Claim is impaired under the Revised Plan.  And, because the Secured Tax Claim is allowed to be "classified", Class 4 is an impaired accepting "class" which satisfies Section 1129(a)(10).

There is another feature that distinguishes this case from the cases above holding that there is no impairment if the Section 507(a)8) claim is treated in accordance with Section 1129(a)(9)(C).  Treatment under Section 1129(a)(9)(C) would seem to contemplate that the tax claim is to be paid from cash flow generated from the debtor's ongoing business operations, rather than from an established fund.  Consequently, it does not fit easily into a case such as the one here where there is a dedicated fund earmarked to pay the tax claim and that fund actually contains sufficient funds to pay the principal portion of the claim.  The parties have not cited, and the Court has not found, Section 1129(a)(9)(C) or (D) cases where the claim is to be paid from escrowed funds, and this gives the Court another reason not to embrace the "not impaired if treated under Section 1129(a)(9)(C)" line of cases.

Even if the Secured Tax Claim were found not to be impaired because its treatment is at least as favorable as the statutory minimum treatment in Section 1129(a)(9)(D), that section speaks only to the timing and amount of payments in its treatment of allowed secured tax claims and does not address treatment of the *lien*.  Here, the Plan proposes that the real estate will vest in the reorganized debtor free and clear of liens, including the lien of the Marion County Treasurer.  The proposed loss of the Marion County Treasurer's valid lien rights prior to

payment in full of its claim under the Plan is additional, and significant, impairment under

Section 1124.  A secured creditor must retain its lien for the Plan to be fair and equitable under

Section 1129(b)(2)(A), but the Marion County Treasurer has accepted alternate treatment and

therefore this provision does not apply.  11 U.S.C. § 1129(b)(1).  Nevertheless, acceptance by a

secured creditor does not mean that creditor's claim is not impaired, and the Secured Tax Claim

is "impaired" despite its more favorable treatment than that spelled out in Section 1129(a)(9)(D).

The Court therefore concludes that the Secured Tax Claim is an impaired claim and that Class 4

is entitled to vote on the Plan.

### 2. Artificial Impairment

Next, CWCapital argues that the Debtor has sufficient funds to pay the claim in full on

the Distribution Date and therefore, has "artificially impaired" the class by choosing to pay the

interest on the Secured Tax Claim over three months.  "Artificial impairment occurs when a plan

imposes an "insignificant or *de minimis* impairment on a class of claims to qualify those claims

as impaired under Section 1124.  The chief concern with such conduct is that it potentially

allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal

compliance with the Code while avoiding opposition to reorganization by truly impaired

creditors".  *In re Combustion Eng'g, Inc.*, 391 F.3d. 190, 243 (3rd Cir. 2004).  While the Seventh

Circuit does not appear to have specifically addressed artificial impairment, it has noted that such

an analysis requires an inquiry into the motivation of the Debtor.  *Wabash Valley,* 72 F.3d at

1321 n.10; see also, *In re 203 North LaSalle St. P'ship v. Bank of America (In re 203 North

Street Partnership)*, 126 F.3d 955,  968 (7th Cir. 1997), *rev'd on other grounds*,  *Bank of America

Nat. Trust and Sav. Ass'n v. 203 North LaSalle St. P'ship,* 526 U.S. 434, 119 S. Ct. 1411, 143

L.Ed.2d. 607 (1999).  If the motivation of the debtor was to alter treatment of a class solely to

obtain plan approval by at least one impaired class, and for no legitimate business purpose, the

class is artificially impaired and its acceptance cannot be used to satisfy Section 129(a)(10).  *See,*

*Beal Bank, SSB. v. Water's Edge Ltd P'ship), (In re Beal Bank),*  248 B.R. 668, 691 (D. Mass.

2000).  However, nothing in the Bankruptcy Code prevents a debtor from negotiating a plan in

order to gain acceptance, including impairment of claims.  Indeed, Section 1123(a)(3)

contemplates impairment, and requires that a plan specify the treatment of any class of claims or

interests that is impaired under a plan.  "Moreover, nowhere does the Code require a plan

proponent to use all efforts to create unimpaired classes."  *Connecticut Gen. Life Ins. Co. v.*

*Hotel Assocs. of Tucson (In re Hotel Assocs. of Tucson)*, 165 B.R. 470, 475 (B.A.P. 9th Cir.

1994) (citation omitted).   "Under the statutory scheme for the classification and treatment of

claims, a plan proponent may impair a class of claims.  If an impaired class accepts the plan, the

requirement of section 1129(a)(10) is satisfied.  Of course, the classification and treatment of

classes of claims is always subject to the good faith requirements under § 1129(a)(3)."  *In re*

*Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, (Bankr. D.N.J. 2000).

  First, the Secured Tax Claim is not in an amount that is *de  minimus.*  Although

CWCapital intimated that the true amount of interest was only $1,000, the only evidence

presented at confirmation was that the interest would amount to approximately $12,422.78 (the

undisputed principal portion of the claim times proposed interest of 8% ).   Second, the

testimony was that the Debtor's motivation was to propose a plan that would be accepted by

creditors, including the Marion County Treasurer, and that would allow the Debtor to reorganize.

The funds in the Escrow Account from which the Secured Tax Claim is to be paid were

earmarked for property taxes, insurance premiums, tenant improvements and deferred

maintenance.  The Debtor's cash flow projections for 2011-2015 attached to its disclosure

statement provide for payment of property taxes and insurance premiums.  The Plan and the cash

flow projections provide for the establishment of a $250,000 reserve for tenant improvements,

leasing commissions expense, roof repair, parking lot repair and exterior payment.  Of that

amount, $150,000 is for tenant improvements that the Debtor says will be needed when the

Debtor finds a tenant to fill the vacant space at the Property.  Thus, all four areas for which the

funds in the Escrow Account may be used are provided for in the projections, but only the

property taxes accrue interest.  It makes perfect business sense for the funds in the Escrow

Account to be used to first pay the only debt which accrues interest.  *See,* 11 U.S.C. §511.  When

questioned by CWCapital's counsel as to the amount of funds on hand to pay the interest portion

of the Secured Tax Claim, Bradley testified "[t]he escrow account does not have enough money

to pay both the real estate taxes and the interest, so the interest is being paid out of the proceeds

generated in the first two months of the plan".  [Transcript, November 19, 2010, A.M. Session, p.

102, lines 3-11].  CWCapital argues that the Debtor could have used a portion of the $150,000

tenant improvement reserve to pay the interest upon the Distribution Date because the Debtor

estimated that it would take at least seven months from the time a party first expresses interest in

the space to execution of a lease, before construction on the space could begin.  Yet, the reason

for the reserve is to attract tenants and improve the Property thus resulting in increased rents,

which is in CWCapital's interest.  The Court concludes that the "impairment' of the Secured Tax

Claim is not *de minimis*, there is a good business reason why the principal is being paid upon the

Distribution Date, (to avoid additional accrual of interest) and an equally good business reason

why the payment of interest  is spread over two months (insufficient funds in the Escrow

Account at confirmation to pay both principal and interest).   The fact that the Debtor "could"

have drawn upon other funds to pay the claim in full does not render the claim "artificially

impaired".  As long as the Debtor has a good business reason to treat the claim as it did, CWCapital cannot require the Debtor to alter treatment so that the claim is "unimpaired".  The Secured Tax Claim is not "artificially impaired" and therefore its vote in favor of the Plan can be counted for purposes of Section 1129(a)(10).

### D.  Absolute Priority Rule

Class 6 of the Plan consists of the holders of equity interests of the Debtor, all of which are currently held by George.  George's current equity interests will be cancelled on the Effective Date of the Plan (the date the confirmation order become a final order).  George will receive no distribution nor retain any property under the Plan.  New equity in the Reorganized Debtor will be issued to a new limited partner and a new general partner both owned by Mary Clare in exchange for a $100,000 cash infusion.   None of the $100,000 cash infusion originates from the Debtor or George.

Class 5A consists of CWCapital's unsecured deficiency claim which is over two million dollars.  Class 5A is impaired and has rejected the Plan.  The Plan cannot be confirmed over CWCapital's  objection  unless "the holder of any claim or interest that is junior to the claims of such [impaired, objecting] class will not receive or retain under the plan on account of such junior claim or interest any property…".  Section 1129(b)(2)(B)(ii).  This provision, known as the "absolute priority rule" basically means that the claims of an objecting impaired class must be paid in full before the class of claims junior to it is to retain any interest.

The holder of the junior interest can get around the absolute priority rule if the holder contributes "new value".  The "new value" so contributed must be (1) in money or money's worth; (2) that is reasonably equivalent to the value of the new equity interest in the reorganized debtor and (3) that is necessary for implementation of a feasible reorganization plan.

*Woodbrook*, 19 F.3d at 319-320.  The equity interest holder, however cannot take advantage of its unique position with the debtor by cutting a "deal" and lowballing the amount of the new value contributed.  Rather, the equity interest holder must contribute "top dollar" and the way to ensure that is to market test the interest to be retained under the plan or to allow others to file a competing plan. *Bank of America National Trust & Savings Assn. v. 203 North LaSalle St. P'ship,* 526 U.S. 434, 457-58, 119 S.Ct. 1411, 1422-23 (1999).   Thus, it is the "exclusiveness of the opportunity [to retain an equity interest in the debtor by contributing new value], with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals [that] renders the partners' right of a property interest extended 'on account of' the old equity position …"  526 U.S. at 456, 119 S.Ct. at 1423.

Read literally, Section 1129(a)(2)(B)(ii) prohibits *current holders of equity interests* from retaining any interests or property on account of their equity interests unless senior classes are paid in full.   Taken literally, *George* is prohibited from retaining any interest or property on account of his equity interest unless CWCapital's unsecured deficiency claim is paid in full.  Since *George* retains nothing under the plan (his interests will be cancelled on its effective date) the absolute priority rule is not implicated and *LaSalle* does not apply.

Because the contributors of new value consisted of "old equity" in the debtor, *LaSalle* did not have to decide whether a party one degree removed from such status, i.e., an insider of "old equity", also fell under the ambit of the absolute priority rule.  One court that did consider the question read *LaSalle* literally and held that infusion of new capital by the husband (the plan sponsor) of the daughter whose father was an existing shareholder pursuant to a plan that did not allow for credit bidding or market testing did not violate the absolute priority rule, even where the debtor was a single asset real estate partnership. *Beal Bank,* 248 B.R. at 680.   "The bottom

line is that neither the credit bid provision nor the new value corollary as described by *LaSalle*

applies here.  The Bankruptcy Code does not prohibit such sales, and instead relies on the

confirmation requirements as the safety net." *Id.* (citing 11 U.S.C. § 1129(b)(1)).  A similar

result may be found in *Troy Savings Bank v. Travelers Motor Inn, Inc.*, 215 B.R. 485 (N.D.N.Y.

1997).  In that case, the lender objected to a plan that proposed to sell equity in the reorganized

debtor to a company owned by a personal friend of the debtor's principal owner.  "Such a

transfer does not implicate the absolute priority rule set forth in 11 U.S.C. § 1129(b)(2)(B)

because the Debtors are not retaining any equity ownership of stock in the reorganized

corporation.  Thus, by definition, § 1129(b)(2)(B) is not implicated." *Id*. at  494.  Finally, in *In*

*re Century Glove, Inc.,* C.A. No. 90-400-SLR, 1993 U.S. Dist. LEXIS 2286, at *27 (D. Del. Feb.

10, 1993), the district court held that the absolute priority rule is not implicated when a plan

proposes to issue equity to the co-owner of the debtor's parent corporation.

Some courts have not read *LaSalle* and Section 1129(b)(2)(B)(ii) so literally.  The

application of the absolute priority rule was extended to a non-owner insider in *In re Global*

*Ocean Carriers Ltd.,* 251 B.R. 31 (Bankr. D. Del. 2000) where the court determined that the

"exclusive opportunity" to determine who will be the owner of the reorganized debtor is a

property interest that must be marketed, even when the proposed owner is neither a creditor nor

current owner of the debtor.  *Id.* at 49.   However, the Court reads Section 1129(b)(2)(B)(ii)

literally and in so doing finds that the absolute priority rule does not apply to individuals who are

not current owners of the debtor, whether or not those individuals are insiders.  "All statutory

interpretation begins with the language of the statute itself, and where the statute's language is

plain, the sole function of the courts is to enforce it according to its terms." *Thompson Designs,*

*Inc. v. Treasurer of Hamilton County (In re Thompson Designs, Inc.)*, 213 B.R. 725, 728 (Bankr.

S.D. Ind. 1997) (citations and internal quotation omitted).  Here, George's ownership interest in the Debtor will be cancelled and he will receive no distribution or retain any property under the Plan.   Section 1129(b)(2)(B)(ii) does not apply.

While Section 1129(b)(2)(B)(i) read literally does not apply to insiders of old equity, the insider nonetheless cannot be used by old equity to retain its interest.  *Beal Bank,* 248 B.R. at 680 (finding that  insider private transactions, which by their nature are not arm's length transactions, "raise the very real spectre that insiders might receive favorable terms at the expense of creditors", and therefore require heightened scrutiny).   CWCapital argues that Mary Clare, as George's wife, is a "straw person", that the sale of new equity to her is not an arms- length transaction, and that Mary Clare's purchase of new equity indirectly allows George to retain his equity interests in the Debtor.  Evidence at the confirmation hearing revealed that Mary Clare currently owned not only TBC but also five TBC Centers which George deeded to her in January 2010 for estate planning reasons.  Furthermore, Mary Clare purchased from George the stock in nine other TBC Centers for $150,000 of her own funds in May 2010.  George sold the stock to her to raise personal capital.  The acquisition of interests in these fourteen TBC Centers was undertaken also to diversify her portfolio.

Mary Clare also testified that she had no intention of reconveying the partnership interests in those entities to her husband.  She also testified that she was making the investment of $100,000.00 with her own funds.  She has a vested interest in buying the equity of the reorganized Debtor because, among other reasons, she is the current owner of TBC, the operating manager of the shopping centers which she owns.  TBC will continue to manage the shopping centers upon confirmation.  Mary Clare has never been an owner, partner, or employee

of the Debtor, and has never had any other legal relationship to the Debtor. She is not retaining any interest as a result of the Plan but is acquiring an interest by a cash infusion.

Perhaps the most persuasive evidence that Mary Clare is not just a "straw person" who intended to later transfer her interest in the Debtor back to George, was the fact that she either owned or has an interest in a number of TBC Centers, as well as TBC, as a part of her investment portfolio.  If Mary Clare has no interest in retaining ownership of the Debtor, as CWCapital seems to imply, it is difficult to understand why she would have purchased these shopping centers as well as TBC before seeking to acquire equity in the Debtor.   While Mary Clare may not have been previously involved in the operations of TBC or any of the TBC Centers, it seem that she has, for whatever reason, a new found interest in acquiring much of the TBC holdings. Once she acquired these holdings, it is reasonable that, for the first time, she would be interested in the TBC organization.  The Court finds that she is neither a "straw person" for George nor "simply a substitute for old equity".  The absolute priority rule of *LaSalle* does not apply.

Assuming *arguendo* that it does and that *LaSalle* applies to insiders of old equity, CWCapital's next argument is that the Plan violates the absolute priority rule because the Debtor failed to market test the value of the equity to be issued to the reorganized Debtor as required by *LaSalle.*  Here, the Debtor proposes to issue equity interests in the reorganized debtor to Mary Clare for $100,000.  George testified that "There was no negotiations" regarding the $100,000 purchase price of the equity.  [See Transcript, November 16, 2010, A.M. Session, p 26, line 14.] When asked if any consideration was given to trying to find someone else to purchase the equity, Bradley stated, "No, because I don't know who would buy it."  [See Transcript, November 19, 2010, A.M. Session, p90L23 – p91L2.]   Bradley testified that she has had 36 years of experience in financing shopping centers and overseeing the financial aspects of such shopping centers and

that there is no marketplace for the sale of the Debtor.  She also testified that there have been some shopping centers on the market in the Indianapolis/ Greenwood area in 2010 but none have sold.

The evidence presented at the confirmation hearing was that ownership of the reorganized Debtor in return for a cash infusion of $100,000.00 is not currently worth $100,000.00, especially in light of the current value of the Debtor's property and the required debt service imposed by the Plan.  In addition, Mary Clare will not realize any return until 2014, and then only in the amount of $5,000.00.  The evidence indicated that Mary Clare's agreement to infuse a capital contribution in the amount of $100,000.00 in cash in return for ownership of the Reorganized Debtor was a fair value sum, if not greater than fair value.

The Supreme Court in *LaSalle* suggested that "exposure to the market," rather than bankruptcy court valuation, is the proper way to value equity interests, stating "in the interest of statutory coherence, a like disfavor for decisions untested by competitive choice ought to extend to valuations in administering subsection (b)(2)(B)(ii) when some form of market valuation may be available." *LaSalle*, 526 U.S. at 457-58, 119 S. Ct. at 1423-24.  There was testimony of "competitive choice".  CWCapital's witness, Demetrios Morakis, testified that CWCapital would be willing to invest $1,000,000 in the reorganized Debtor in exchange for ownership of new equity.  Upon closer examination, Morakis testified that, from the $1,000,000 infusion, $100,000 would be paid to administrative and Class 5B claimants and that the $900,000 balance would be applied to CWCapital's outstanding loan, resulting in a new cash infusion of $100,000. [November 19, 2010 transcript, P.M. session, page 146, lines 2-25; page 147, line 1].  Upon questions from the Court, Morakis testified that it would not be CWCapital that would provide the funds.  Rather, it would be the master servicer of the loan, but Morakis was not sure who the

master servicer was, as he testified it was either Wells Fargo or Arcadia. Morakis was not employed by the master servicer. Although he could make recommendations with respect to the purchase of equity, he was not authorized by the master servicer to offer $1,000,000 for the Debtor's equity. [November 19, 2010 transcript, P.M. session, pages 125-127 and page 128, lines 1-3]. Unlike Mary Clare, who intends to hold the Property for the long-term and continue its operation as a shopping center, Morakis could not say whether CWCapital would sell the property or hold it. There was further testimony that the Debtor unsuccessfully sought alternate financing from sources that included CWCapital. Bradley testified that she had sent out several packages in an effort to obtain new financing. She testified that she either did not receive a response or that the response received was to come back when the Debtor is out of bankruptcy and when the vacancy rates for the Debtor's shopping center was between 7% and 10%. The current vacancy rate is 21%. Thus, none of the approached lenders, including CWCapital, agreed to finance the Debtor, given the severe downturn of the commercial real estate market. The Court doubts that a bidding war to purchase the new equity would result because a potential purchaser would be assuming over seven million dollars of debt for a shopping center worth just over four million. Although the Court concludes that the circumstances of this Chapter 11 case do not invoke the absolute priority rule, and that, accordingly, there was no requirement to "market test" the offer made by Mary Clare to infuse $100,000.00 in cash in return for becoming the owner of the reorganized Debtor, it appears to the Court that even if such marketing were required, the offer of Mary Clare is equal or better in amount to any other offer anticipated and better in the long-term for the creditors of the bankruptcy estate.

CW Capital's final argument is that Mary Clare's $100,000 cash infusion is not "substantial" in that it amounts to only 4.2% of unsecured claims, including  CWCapital's

42

unsecured deficiency claim.  Equity contributions representing 3.8% ($100,000) and 2.7%

($30,000) of the unsecured debt, respectively, have found to be "token" contributions and thus

not substantial enough to pass the new value test.  See, *203 North LaSalle,* 126 F.3d  at 967,

citing *Woodbrook,* 19 F.3d at 310 and *In re Snyder*, 967 F.2d 1126, 1131 (7th Cir. 1992).  While

4.2% appears paltry at first blush, the Court believes the cash infusion to be "substantial" in light

of the circumstances here.  Besides, this inquiry is relevant only if the absolute priority rule

applies, and, as noted above, it does not.

    Therefore, the absolute priority rule does not apply because George is not retaining an

interest or property in the reorganized Debtor.  Even if Section 1129(b)(2)(B)(ii) is applied

loosely, thus implicating the absolute priority rule and its market testing requirements, Mary

Clare's $100,000 cash infusion was the best that a potential buyer would offer and, under the

circumstances here, is "substantial".  Accordingly, the Plan meets the requirements of Section

1129(b)(2)(B)(ii).

### E.  Good Faith

    The Debtor must propose a plan in good faith.  11 U.S.C. § 1129(a)(3).  "Good faith is

not defined in the Bankruptcy Code, but generally means that there is a reasonable likelihood

that the proposed plan will achieve results that are consistent with the objectives of the

Bankruptcy Code.  *203 North LaSalle,* 126 F.3d at 969; *In re Madison Hotel Associates*, 749

F.2d 410, 425 (7th Cir. 1984);  *In re Andreuccetti*, 975 F.2d 413, 420 (7th Cir. 1992). A court

considers the totality of the circumstances in determining whether the plan has been proposed in

good faith under Section 1129(a)(3).  *Beal Bank*, 248 B.R. at 688.

    A chapter 11 debtor's objection under the Bankruptcy Code is to reorganize.  There was

frequent testimony that Plan was in the best interests of creditors and that confirmation of the

Plan would enable creditors to continue established business relationships with the Debtor. The Debtor's financial projections and testimony with respect to future revenues were conservative and achievable. There is a high likelihood that the Debtor's business will be successfully reorganized if the Plan is confirmed. The process by which the Plan was formulated was the product of zealous representation and not in contravention of the Bankruptcy Code. The Court has found that (1) the Debtor's separate classification of CWCapital's unsecured deficiency claim was proper, (2) the Gracey Claim and the Gracey Purchased Claims are allowed for voting purposes; (3) the secured tax claim of the Marion County Treasurer was impaired, and not artificially; and (4) the Debtor was not required to market test the cash infusion contributed by Mary Clare, and even if it was, the market bore out that the amount of the cash infusion was adequate. There is no question that the Debtor "did what it had to do" in order to obtain the acceptance of an impaired, non-insider class, but active solicitation of garnering sufficient votes in favor of the Plan is permitted under the Code. The Court can think of few plans that an undersecured lender in a single asset real estate partnership case would vote to accept. See, *Id*. at 688, ([h]owever, the plan need not be one "'that the creditors themselves would design"). The Plan was proposed in good faith as required by Section 1129(a)(3).

### F. Section 1129(a) Requirements

Section 1129(a) provides that the Court "shall" confirm a plan only if all of the requirements set forth in that section are met. The Court finds the following with respect to the requirements for confirmation of the Plan under Section 1129(a):

Plan's Compliance with § 1129(a)(1) of the Bankruptcy Code. The Plan complies with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, thereby satisfying § 1129(a)(1) of the Bankruptcy Code:

a.      Proper Classification (§§ 1122 and 1123(a)(1) of the Bankruptcy Code).
The Plan designates six Classes of claims and one Class of Equity Interest, including a separate Class for Claims arising under § 507(a)(2) of the Bankruptcy Code, which Class is not required to be classified.   The Claims and Interests placed in each Class are substantially similar to other Claims or Interests in each such Class.   Valid business, factual and legal reasons exist for separately classifying the various Classes of claims and interests created under the Plan, and such Classes do not unfairly discriminate between the holders of Claims and interests.   Thus, the Plan satisfies §§ 1122 and 1123(a)(1) of the Bankruptcy Code.

b.      Specification of treatment of classes (§§ 1122 and 1123(a)(2) and (a)(3) of the Bankruptcy Code).   The Plan specifies the Classes of Claims and Interests that are impaired and unimpaired under the Plan and the treatment of impaired and unimpaired Classes interests in such Classes.   Thus, the Plan satisfies §§ 1122, 1123(a)(2) and (a)(3) of the Bankruptcy Code.

c.      No Impermissible Discrimination (§ 1123(a)(4) of the Bankruptcy Code).
The Plan provides for the same treatment of each Claim or Interest in each respective Class.   Thus, the Plan satisfies § 1123(a)(4) of the Bankruptcy Code.

d.      Implementation of the Plan (§ 1123(a)(5) of the Bankruptcy Code).   The Plan provides adequate and proper means for implementation, including, without limitation, "(a) provisions for distributions to holders of allowed claims; (b) the issuance of new equity interests in the Reorganized Debtor in return for a capital infusion of $100,000.00 in cash; and (c) the granting of security interests and liens to secure the

45

treatment provided to Class 1 (Allowed Secured Claim of CWCapital).  Thus, the Plan satisfies § 1123(a)(5) of the Bankruptcy Code.

e.      Prohibition Against Issuance of Non-Voting Equity Securities and Provisions for Voting Power of Classes of Securities (§ 1123(a)(6) of the Bankruptcy Code).  The Plan provides that all equity interest in the Debtor will be canceled.  The Debtor is a limited partnership and not a corporation.  The plan makes no provision for a change to the charter of the Debtor.  Accordingly, the provisions of § 1123(a)(6) of the Bankruptcy Code are inapplicable.

f.      Selection of Officers, Directors, or Trustees (§ 1123(a)(7) of the Bankruptcy Code).  Article 5.3 (Issuance of Equity Interests) of the Plan properly and adequately disclosed or otherwise identified the entity and individual (Mary Clare or entities owned by her) that will become the owner of the partnership in return for a capital infusion of $100,000.00 in cash.  Article IX (Management of the Reorganized Debtor) adequately disclosed that the property of the Reorganized Debtor will continue to be managed by the Debtor's current property manager, The Broadbent Company, Inc., and that the current management contract is assumed and assigned to the Reorganized Debtor with the management fees unchanged.  Thus, § 1123(a)(7) of the Bankruptcy Code is satisfied.

g.      Provision in a Case in Which the Debtor is an Individual (§ 1123(a)(8) of the Bankruptcy Code).  Because the Debtor is not an individual, § 1123(a)(8) of the Bankruptcy Code is inapplicable.

h.      Permitted Plan Provisions (§ 1123(b) of the Bankruptcy Code).  The Plan's provisions are appropriate and consistent with the applicable provisions of the

Bankruptcy Code, including, without limitation, provisions for: (1) distributions to holders of Allowed Claims; (2) the disposition of executory contracts and unexpired leases; (3) resolution of disputed Claims; (4) allowance of certain Claims; (5) indemnification obligations; (6) issuance of new equity interests; (7) except as otherwise provided in the Plan, the transfer and vesting of all of the assets, properties and rights of the Debtor in the Reorganized Debtor free and clear of all liens, claims, rights of set-off, security interests, pledges, encumbrances, adverse rights of interest, covenants, charges, debts and contractually imposed restrictions; (8) granting of a mortgage and security interests to secure the treatment of the Class 1 claim (CWCapital Secured Claim); (9) transfer to the Reorganized Debtor of all causes of action, if any, under any theory of law or equity, from the Debtor to the Reorganized Debtor; and (10) provisions for payment of fees owed and to become due to the office of the United States Trustee. Thus, the Plan satisfies § 1123(b) of the Bankruptcy Code.

   i.      Date of Plan and Disclosure of Plan/Filer (Bankruptcy Rule 3016(a)).  The Plan is dated October 15, 2010 and identifies that the Debtor and Debtor-In-Possession, by its counsel, are the submitting entities, thereby satisfying Bankruptcy Rule 3016(a).

Plan's Compliance With § 1129(a)(2) of the Bankruptcy Code.  The Debtor is a proper debtor under § 109 of the Bankruptcy Code and the Debtor is a proper plan proponent under § 1121 of the Bankruptcy Code.  The Debtor has complied with the applicable provisions of the Bankruptcy Code, orders of the Court, the Bankruptcy Rules, the Local Rules, the Disclosure Statement, the Order approving the Disclosure Statement, the Solicitation Package, and the Ballot Report.  Thus, the requirements of § 1129(a)(2) have been satisfied.

Plan's Compliance With § 1129(a)(3) of the Bankruptcy Code. The Plan has been proposed in good faith and not by any means forbidden by law. In making this finding, the Court has examined the totality of the circumstances surrounding this bankruptcy case, and the fact that the Plan complies with the applicable provisions of Title 11. The Chapter 11 case was filed and the Plan was proposed with the legitimate and honest purpose of reorganizing the business of the Debtor and maximizing the value of the Reorganized Debtor and the recovery to holders of Allowed Claims. The fact that the Debtor and its counsel assisted certain Class 5B claimants in voluntarily purchasing claims from other general unsecured creditors for the purpose of voting those claims to accept the Plan do not constitute actions in bad faith nor do those actions have the result that the Plan was not proposed in good faith. The Court also notes that all of the creditors in this case cast their ballot or ballots and all of the creditors of the Debtor, except for CWCapital and claims purchased by CWCapital, were cast to accept the Plan.

Payments for Services or Costs and Expenses (§ 1129(a)(4)). Any payments made or to be made by the Debtor or the Reorganizing Debtor for services or for costs and expenses in connection with the Chapter 11 case, including all administrative expense and payments due or to become due to the office of the United States Trustee have been provided for in the plan subject to, where required, approval of the Bankruptcy Court as reasonable. Thus, § 1129(a)(4) of the Bankruptcy Code is satisfied.

Directors, Officers, Successors and Insiders (§ 1129(a)(5)). The Debtor, as the proponent of the Plan, has disclosed that the equity interest in the Debtor will be canceled and new equity interests will be issued to entities owned and controlled by Mary Clare, the wife of the Debtor's owner, George Broadbent, in return for a capital infusion into the Reorganized Debtor in the amount of $100,000.00 in cash. The Plan also discloses that the property management contract

with The Broadbent Company, the Debtor's property manager, a company owned by Mary Clare, will be assumed and The Broadbent Company will provide property management services to the Reorganized Debtor on the same terms and for the same rate as was in existence during the course of this bankruptcy case.  Because Mrs. Broadbent is making a substantial cash, capital contribution and thereby improving the likelihood of the financial success of the Reorganized Debtor and because she has accepted the provisions of the Plan that delay any return on her investment until the 2014, her role as the new owner of the partnership is in the best interest of the creditors of the Debtor.

No Rate Changes (§ 1129(a)(6)).  § 1129(a)(6) of the Bankruptcy Code is not applicable because the evidence established that there are no rates charged by the Debtor or to be charged by the Reorganized Debtor that require any approval of any governmental regulatory commission.

Best Interests Test (§ 1129(a)(7)).  Although each holder of a claim in an impaired class of claims has not accepted the Plan (CWCapital, a claimant in Class 1, Class 5A and the holder of two purchased claims in Class 5B, has not accepted the Plan), in each of those instances CWCapital will receive or retain under the Plan on account of such claims property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under Chapter 7 of this title on such date.  The evidence at the confirmation hearing was that the liquidation value of the Debtor's property was $3,525,000.00 pursuant to the March 31, 2010 appraisal completed by Mr. John T. Jameson, III.  Debtor's Exhibit 4.  Further, the evidence demonstrated that in a liquidation under Chapter 7 only the secured tax claim of the Marion County Treasurer and part of the secured claim of CWCapital would be able to be satisfied from the liquidation proceeds.  The Plan provides for

payment in full of the secured tax claim of the Marion County Treasurer, plus in excess of $4,500,000.00 on the secured claim of CWCapital, plus approximately $326,000.00 on the deficiency claim of CWCapital and a fifteen-cent dividend to the Class 5B general unsecured creditors.  Thus, the requirements of § 1129(a)(7) of the Bankruptcy Code have been satisfied.

Acceptance by All Impaired Classes (§ 1129(a)(8)).  Because Class 1 (Secured Claim of CWCapital) and Class 5A (Allowed Non-Priority Unsecured Claim of CWCapital) did not accept the Plan and because those Classes are impaired under the Plan, the Debtor has failed to comply with § 1129(a)(8). The Debtor has requested that the Plan be confirmed over the non-acceptance of an impaired class, Class 5A, pursuant to the "cramdown" provision of Section 1129(b)(1).

Treatment of Administrative and Priority Claims (§ 1129(a)(9)).  The Plan provides for payment in full of the administrative claims in Classes 2 and 3 in that administrative claims of Class 2 (Bankruptcy Court Costs and Professional Fees) are to be paid in full, in cash, once those claims become allowed claims.   Further, the Plan provides that the claims in Class 3 (Administrative Operating Expenses) shall be assumed and paid by the Reorganized Debtor in the ordinary course of business after the effective date in accordance with established terms. There are no other classes of priority claims in this bankruptcy case.  Although § 1129(a)(9)(D) permits the Debtor to pay a secured tax claim that would otherwise meet the description of an unsecured claim of a governmental unit under § 507(a)(8), but for the secured status of that claim, in deferred cash payments in the same manner and over the same period as the Debtor would pay such tax claim if it were an unsecured priority tax claim under § 507(a)(8), the Debtor is not required to do so.  As provided in § 1129(a)(9), the holder of a particular claim and the debtor can agree to a different treatment.  In the Plan, based upon an agreement between the

Debtor and the Marion County Treasurer, the secured tax claim of the Marion County Treasurer has been provided for pursuant to the Plan's treatment of Class 4 (Secured Tax Claim). Thus, the Plan satisfies the requirements of § 1129(a)(9).

Compliance With § 1129(a)(10) of the Bankruptcy Code. In this case, two Classes of claims that are impaired under the Plan (Class 4 – Secured Tax Claim and Class 5B – Allowed Non-Priority Unsecured Claims) have voted to accept the Plan, determined without including any acceptance of the Plan by an insider. Thus, the requirement of § 1129(a)(10) of the Bankruptcy Code has been met.

Feasibility of the Plan (§ 1129(a)(11)). The financial projections submitted into evidence at the confirmation hearings and the testimony of Bradley were both persuasive and credible that the rental revenue anticipated post-confirmation is stable and projections of increased revenue from additional tenants was projected to not occur for two years. Further, the projections demonstrated that the Reorganized Debtor is maintaining reserves for tenant improvements in order to attract additional tenants and a reserve for repairs, maintenance and replacement. In addition, the uncontroverted evidence was that the property of the Debtor, a shopping center, is well-located and, once the economy improves, should be able to attract additional tenants. The undisputed evidence also was that the Debtor had never failed to pay any of its obligations, including payments due to CWCapital, until the loan matured. The evidence regarding the value of the property and the likelihood that the Reorganized Debtor would be able to make all payments required under its Plan was not controverted by other evidence nor sufficiently challenged in any of the objections to the Plan. The evidence establishes that the Plan is feasible and that confirmation of it is not likely to be followed by the liquidation or need for further financial reorganization of the Reorganized Debtor. Upon the Effective Date, the Reorganized

Debtor will have sufficient operating cash and liquidity to meet its financial obligations under the Plan, to fund ongoing business operations, and pay all anticipated Allowed Administrative Claims and make the payments provided for to creditors in the Plan. Thus, the Plan complies with § 1129(a)(11).

Payment of Fees (§ 1129(a)(12)). The Debtor or the Reorganized Debtor has paid or, pursuant to Article III of the Plan, will pay by the Effective Date, fees payable under 28 U.S.C. § 1930 and any such fees arising thereafter. Thus, § 1129(a)(12) of the Bankruptcy Code has been satisfied.

Retiree Benefits (§ 1129(a)(13)). Because the Debtor and the Reorganized Debtor do not have any retiree benefit plans as defined in § 1114 of the Bankruptcy Code, § 1129(a)(13) is inapplicable.

### G.  Cramdown Under Section 1129(b)

Two impaired, non-insider classes, Class 1 (Allowed Secured Claim of CWCapital) and Class 5A (Allowed Non-Priority Unsecured Deficiency Claim of CWCapital) have rejected the Plan. Pursuant to § 1129(b) of the Bankruptcy Code, the Plan may be confirmed notwithstanding the fact that not all impaired Classes have voted to accept it. All of the requirements of § 1129(a) of the Bankruptcy Code, other than § 1129(a)(8), with respect to Classes 1 and 5A, have been met.

To confirm a plan over impaired classes that have not accepted it, Section 1129(b)(1) requires that the plan not discriminate unfairly and must be fair and equitable with respect to each impaired class that has not accepted the plan. With respect to Class 1, the Plan provides that CWCapital will retain liens securing its Class 1 Allowed Secured Claim and that Class 1 shall receive on account of its claim deferred cash payments totaling at least the allowed amount

of such claim, of a value, as of the Effective Date of the Plan, of at least the value of such holder's interest in the estate's interest in such property. The treatment provided for in the Plan for Class 1 provides that the Reorganized Debtor will issue a mortgage and security interest and assignment of rents to secure the payments to be made on the Class 1 claim and the Plan provides for monthly payments of principal and interest on a ten-year note with a balloon at an interest rate of 6.25%, which is the current Prime Rate plus 3%, as evidenced by the exhibits presented by the Debtor at the confirmation hearing.

The evidence at the confirmation hearing was that currently there is no efficient marketplace for loans like that provided for Class 1 as a result of the facts that in today's economic climate, lenders are not lending to borrowers like the Debtor due to its bankruptcy status and level of vacancies. Thus, pursuant to *Till v. SCS Credit Corp.*, 541 U.S. 465, 474, 124 S.Ct. 1951, 1961 (2004), and consistent with the decisions of the Sixth Circuit in *Am. Homepatient, Inc., Bank of Montreal v. Official Comm. of Unsecured Creditors (In re Am. Homepatient, Inc.),* 420 F.3d 559, 568 (6th Cir. 2005) and *In re Northwest Timberline Enters., Inc.*, 348 B.R. 412, 434 (Bankr. N.D. Tex. 2006), where there is no efficient marketplace to establish the rate of interest in a cramdown, the Court will use the current Prime Rate and add basis points thereto to the extent that the loan is determined to be risky, and in a number sufficient to compensate for the unusual risk. Here, the Debtor has added three basis points to the current Prime Rate of 3.25% for a total interest rate of 6.25%. The evidence at the confirmation hearings was that the debt owed on Class 1 was not a risky loan given that it is fully collateralized; the cash projections of the Debtor were conservative yet demonstrated the ability to pay the loan payments; reserves were maintained to attract additional tenants and to maintain and enhance the collateral; the collateral is likely to go up in value over the life of the loan; and

in light of the Debtor's history of always making timely debt payments until the loan matured. Thus, the 6.25% interest for the ten-year note is a sufficient interest rate.

With respect to Class 5A, the Plan provides that the holder of a claim or interest that is junior to the claim of Class 5A will not receive or retain any claim or interest under the Plan on account of such junior claim or interest. The Court has already found that the Plan does not violate the absolute priority rule, as provided for in Section 1129(b)(2)(B)(ii). Thus, the Court finds that the Plan is fair and equitable with respect to both Class 1 and Class 5A and that it meets the requirements of Section 1129(b)(2).

Confirmation of One Plan ( §1129(c)). No competing plans were filed and thus confirmation of only the Plan is sought. The Plan complies with§ 1129(c).

Avoidance of Taxes (§ 1129(d)). The Plan provides for prompt payment of the only tax claim in this Chapter 11 case. Accordingly, the principal purpose of the Plan is not the avoidance of taxes nor the avoidance of the application of §5 of the Securities Act of 1993 (15 U.S.C. §77e).

The Court makes these additional findings:

Jurisdiction and Venue. The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of a plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

Judicial Notice. The Court takes judicial notice of the docket of this bankruptcy case and all proceedings commenced herein including, without limitation, all documents and pleadings filed, all orders entered, and all evidence and arguments made, proffered or admitted at the hearings held before the Court during the pendency of this case and proceedings.

<u>Transmittal and Mailing of Materials; Notice.</u>  Due, adequate and sufficient notice of the Revised Disclosure Statement and Revised Plan and of the Confirmation Hearing, along with all deadlines for voting on or filing objections to confirmation of the Revised Plan, has been given to all creditors, equity security holders, other parties in interest, and the United States Trustee. The Debtor filed its Certificate of Service evidencing that the Debtor, consistent with the Order approving the Debtor's Revised Disclosure Statement, served a copy of the Revised Disclosure Statement, the Revised Plan, a ballot or ballots for voting purposes, and a copy of the Court's October 15, 2010 Order Approving Disclosure Statement, Scheduling Confirmation Hearing, and Fixing Filing Deadlines (collectively, the "<u>Solicitation Package</u>") to all creditors, equity security holders, other parties in interest and the United States Trustee in accordance with Rule 3017 of the Federal Rules of Bankruptcy Procedure.  Docket No. 117.

<u>Solicitation.</u>  Revised Plan votes were solicited in good faith and in compliance with §§ 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3017, the Revised Disclosure Statement, orders of this Court, the Local Rules of the United States Bankruptcy Court for the Southern District of Indiana, and any applicable General Orders and all other applicable provisions of the Bankruptcy Code.

<u>Ballots.</u>  All procedures used to distribute the Solicitation Package and to tabulate ballots were fair and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable rules, laws and regulations.

<u>Ballot Report.</u>  On November 12, 2010, the Debtor filed its Pre-Confirmation Status Report and Ballot Report, certifying the method and results of the ballot tabulation by counsel for the Debtor for each of the voting classes voting to accept or reject the Revised Plan.

Modifications to the Plan.  During the confirmation hearings, the Debtor, in open court, advised the Court and those present that the interest rate to be applied to Class 1 (Allowed Secured Claim of CWCapital) had been increased from 6% to 6.25%, and that the updated five-year projections of the Debtor for the post-confirmation period incorporated an agreement by Mary Clare to refrain from taking any distribution on her $100,000.00 cash, capital infusion until 2014, when she is limited to a $5,000.00 distribution; and 2015, when she is limited to a distribution in the amount of $35,000.00.  These modifications constitute immaterial modifications with respect to the treatment of particular claims, improve the treatment of those claims, and do not materially adversely affect or change the treatment of any other claims. Accordingly, pursuant to Rule 3019 of the Federal Rules of Bankruptcy Procedure, these modifications do not require additional disclosure under § 1125 of the Bankruptcy Code or re-solicitation of votes under § 1126 of the Bankruptcy Code, nor do these changes require that holders of Claims or Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan.

Good Faith Solicitation (§ 1125(e)).  The Debtor and the Debtor-In-Possession, and each of their respective agents, representatives, managers and attorneys, have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. Thus, the Debtor, the Debtor-In-Possession and the agents, representatives, managers, and attorneys of the Debtor and the Debtor-In-Possession are entitled to the protections afforded by § 1125(e) of the Bankruptcy Code.  The Court disagrees with the assertions of CWCapital that efforts of the Debtor, the manager of the Debtor and the Debtor's counsel to assist creditors of the Debtor who voluntarily sought to purchase unsecured claims, have those purchased claims filed and be able to cast ballots in relation to the Plan arising from such claims constituted bad

faith on the part of the Debtor, the Debtor-In-Possession and/or the attorneys for the Debtor and Debtor-In-Possession.

The Reorganized Debtor Will not be Insolvent nor Left With Unreasonably Small Capital.  As of the occurrence of the Effective Date, and after taking into account the transactions contemplated by the Plan, the fair market value of the property of the Reorganized Debtor plus its revenue and its additional capitalization will not be less than the amount that would be required to pay the probable liabilities of the Reorganized Debtor's then-existing debts as they become absolute and matured; and the Reorganized Debtor's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction.  As a consequence, the payments, transactions, liens granted and other transfers contemplated by the Plan on the Effective Date, including the issuance of new of equity to Mary Clare (or entities owned by her) in return for her cash, capital infusion in the amount of $100,000.00, do not constitute fraudulent transfers or fraudulent conveyances pursuant to § 548 of the Bankruptcy Code nor applicable state  law.

Executory Contracts.  The Debtor has exercised reasonable business judgment in determining whether to assume and assign or reject each of its executory contracts and unexpired leases as set forth in Article IV of the Plan.  Each assumption and assignment or rejection of an executory contract or unexpired lease pursuant to Article 4.1 through 4.3 of the Plan shall be legal, valid and binding upon the Reorganized Debtor and all non-debtor parties to such executory contracts or unexpired leases, all to the same extent as if such assumption and assignment or rejection had been effectuated pursuant to an appropriate authorizing order of the Bankruptcy Court entered before the Confirmation Date under §365 of the Bankruptcy Code.

Adequate Assurance.  The Debtor and Debtor-In-Possession have indicated that they believe that neither are in default of any executory contract listed on Exhibit D to the Plan and no cure, compensation, or other adequate assurance of future performance is required under §365(b)(1) of the Bankruptcy Code to assume and assign such Executory Contracts; and the Plan does not provide for any cure, compensation, or adequate assurance of future performance prior to the assumption by the Debtor and assignment to the Reorganized Debtor of those executory contracts.  Nevertheless, at Article 4.3 of the Plan, the Debtor sets forth procedures for any party objecting to the Debtor's proposed assumption of any executory contract, including the Debtor's contention that no cure is required, the provisions of Article 4.3 adequately protect the right of any party to an assumed contract to be heard with regard to the assumption of the contract and any cure issues.

Exculpation and Automatic Stay.  Article VI of the Plan provides that the Debtor, its partners, agents, and professionals (acting in such capacity on and after the Petition Date), shall neither have nor incur any liability to any person or entity for any act taken, or omitted to be taken, on or after the Petition Date with, or related to the performance of their duties for or on behalf of the Debtor in this Chapter 11 case, except for acts or omissions constituting gross negligence or willful misconduct.  Article X (10.3) provides that unless otherwise provided in the Plan or by an order of the Bankruptcy Court, all injunctions or stays provided for in the Chapter 11 case pursuant to §§ 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all distributions required to be made under the Plan have been made.  Each of these provisions are within the jurisdiction of the Court under § 1334 of the Bankruptcy Code and are essential means of implementing the Plan pursuant

58

to § 1123(a)(5) of the Bankruptcy Code and confer material benefits on and are in the best interest of the Debtor, its Estate and its creditors.

Retention of Jurisdiction.  The provisions in Article XI – Retention of Jurisdiction are appropriate and acceptable to the Court.

ACCORDINGLY, IT IS THEREFORE CONSIDERED AND ORDERED AS FOLLOWS:

A.     Confirmation.  The Plan hereby is and shall be approved and confirmed under Section 1129(a).  The terms of the Plan and its exhibits, as amended at the Confirmation Hearing and as may be modified and in their final version, are incorporated herein by reference and are an integral part of this Confirmation Order.

B.     Objections.  Except as otherwise provided herein, all objections to confirmation of the Plan that have not been withdrawn, waived, or settled, and all reservations of rights included therein, hereby are and shall be overruled on the merits.

C.     Provisions of the Plan and Confirmation Order Nonseverable and Mutually Dependent.  The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

D.     Executory Contracts.  Effective on and as of the Effective Date, and except as otherwise provided in the Plan, each Executory Contract listed on Exhibit D to the Plan shall be deemed assumed by the Debtor and assigned to the Reorganized Debtor pursuant to Sections 365 and 1123.  Effective on and as of the Effective Date, and except as otherwise provided in the Plan, any and all Executory Contracts that exist between the Debtor and any party which are not specified on Exhibit D to the Plan shall be deemed rejected pursuant to Sections 365 and 1123,

all to the same extent as if such rejection had been effectuated pursuant to an order of the Court authorizing such action pursuant to Section 365 entered prior to Confirmation.

      E.    <u>Implementation and Consummation of the Plan</u>.  The Debtor and Reorganized Debtor are authorized to take any and all actions necessary or appropriate to implement, effectuate, perform, and consummate the terms and provisions of the Plan, all transactions contemplated by the Plan and/or this Confirmation Order, and all other agreements related thereto, including but not limited to cancellation of all current Equity Interests in the Debtor and issuance of new Equity Interests in the Reorganized Debtor in accordance with the Plan.

      F.    <u>Retention of Jurisdiction</u>.  Pursuant to §§ 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, the Court shall retain exclusive jurisdiction as provided in the Plan over all matters arising out of, and relating to, this bankruptcy case and the Plan to the fullest extent permitted by law, including, among other items and matters, jurisdiction over those items and matters set forth in Article XI of the Plan.

      G.    <u>References to Plan Provisions</u>.  The failure to include or specifically reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety.

      H.    <u>Notice of Confirmation Order</u>.  Promptly following entry of this Confirmation Order by the Court, the Debtor shall serve notice of this Confirmation Order pursuant to Rules 2002(f)(7), 2002(k) and 3020(c) of the Federal Rules of Bankruptcy Procedure on all creditors, equity security holders, other parties in interest, and the United States Trustee, by causing a

notice of this Confirmation Order to be delivered to such parties by first class mail, postage prepaid, or electronic transmittal.

### ###

Distribution:
Paul T. Deignan / Jeffrey J. Graham / Andrew T. Kight, Attorneys for the Debtor
Darek S. Bushnaq, Attorney for CWCapital